JUDGE DANIELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK     04 CV 7417
-------------------------------------------------------X
                                                       :
DAN BROWN and RANDOM HOUSE, INC.,                      :
                                                       :
                          Plaintiffs,                  :   Civil Action No. _____
                                                       :
            - vs. -                                    :   **COMPLAINT**
                                                       :
LEWIS PERDUE,                                          :   RECEIVED
                                                       :   SEP 17 2004
                          Defendant.                   :   U.S.D.C. S.D.N.Y.
                                                       :   CASHIERS
-------------------------------------------------------X

Plaintiffs DAN BROWN and RANDOM HOUSE, INC. ("Random House"), by their undersigned attorneys, Davis Wright Tremaine LLP, as and for their complaint against defendant LEWIS PERDUE, allege as follows:

## NATURE OF THE ACTION

1.  *The Da Vinci Code*, a highly acclaimed thriller written by Dan Brown ("Brown") and published in 2003 by Doubleday, a division of Random House, Inc. ("Random House"), has become one of the bestselling novels of all time, appearing on *The New York Times* bestseller list for the past 77 weeks and to date selling over eight million copies in the United States and Canada alone. Defendant Lewis Perdue ("Perdue") is the author of, among other works, two novels, *Daughter of God* and *The Da Vinci Legacy* ("*Legacy*") that bear little to no resemblance to *The Da Vinci Code*. Nonetheless, in an escalating campaign, Perdue claims that *The Da Vinci Code* infringes copyrights in his works and threatens to sue Brown and Random House for copyright infringement. Apart from stock elements common to the thriller genre or fundamental historical and religious facts and beliefs, *The Da Vinci Code* is strikingly dissimilar to Perdue's books. There is no basis for Perdue's spurious claims of infringement, and Brown and Random House have filed this declaratory judgment action in order to resolve this dispute and obtain a

declaration that *The Da Vinci Code* does not infringe Perdue's copyright or any other interests in his works.

## JURISDICTION AND VENUE

2. Plaintiffs seek a declaration of their rights pursuant to 28 U.S.C. §§ 2201(a) and 2202, in order to resolve an actual controversy within this Court's jurisdiction between the parties. Subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1338(a).

3. This Court has personal jurisdiction over defendant under C.P.L.R. § 302(a)(1) because this action arises out of defendant's transaction of business within the state and contracts to supply goods or services in the state, including but not limited to defendant's contracts for the publication, marketing, sale and distribution of his novels in this State, defendant's calculated campaign within this State to falsely link his works to plaintiffs' novel, *The Da Vinci Code,* and defendant's contacts within the State in the course of attempting to "resolve" this dispute by extracting a settlement; and defendant has established minimum contacts with this State and has purposefully availed himself of the benefits and protections of the laws of this State. This Court also has personal jurisdiction over defendant under CPLR § 302 because defendant has transacted, and continues to transact, continuous, systematic and routine business in this State; and defendant's activities in this State have had, and continue to have, a direct and foreseeable impact on the commerce of this State.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 1400(a).

## THE PARTIES

5. Plaintiff Dan Brown is an individual who resides in New Hampshire.

6. Plaintiff Random House, Inc. is a New York corporation with its principal place of business at 1745 Broadway, New York, New York 10019. Random House is a wholly owned

subsidiary of Bertelsmann Publishing Group, Inc., which is in turn a wholly owned subsidiary of Bertelsmann Inc., which is in turn a wholly owned subsidiary of Bertelsmann AG, a corporation with its principal place of business in Germany.

7.   Defendant Lewis Perdue is an individual who, upon information and belief, resides in Sonoma, California.

## FACTUAL BACKGROUND

### The Da Vinci Code

8.   Dan Brown is the author of four novels, three published before *The Da Vinci Code*. In 2000, Brown's novel *Angels & Demons* was published by Pocket Books, a division of Simon & Schuster, Inc., and told the story of an ancient secret brotherhood that was exposed by "world renowned" Harvard symbologist, Robert Langdon. Following publication of *Angels & Demons*, Brown began writing a sequel to that work based on some of the same research. This sequel ultimately became *The Da Vinci Code*, his second novel featuring the fictional symbologist, Robert Langdon. The historically-based thriller tells the story of Langdon's race to decipher clues hidden in Leonardo Da Vinci's paintings or other inventions and to unlock one of the world's most baffling religious mysteries.

9.   The plot of *The Da Vinci Code* is as follows:

> Set in France, England and Scotland, *The Da Vinci Code* begins with the murder of Jacques Sauniere, curator of the Louvre by an albino monk acting on behalf of Opus Dei, a devout Catholic sect that was in turn acting on the instructions of an unnamed "Teacher." As he is dying in the Louvre galleries, Sauniere leaves a bewildering array of clues, many relating to Leonardo Da Vinci. In invisible ink, he also scrawls: "P.S. Find Robert Langdon." Robert Langdon, Professor of Religious Symbology at Harvard University, is called to the crime scene, where Captain Fache, captain of the French judicial police and a friend of Opus Dei, is trying to frame him for the murder. In bursts Sophie Neveu, an agent of the cryptology department and Sauniere's granddaughter, who had been raised by Sauniere after her family was apparently

killed in a car crash. Sophie recognizes that her grandfather's note is a directive to her using her childhood nickname "Princess Sophie" to find Langdon.

As the story unfolds, it becomes clear that Sauniere was the Grand Master of a secret society named the Priory of Sion. The Priory of Sion is a real organization founded in 1099 whose members included Sir Isaac Newton and Da Vinci. In the book, the Priory of Sion has for centuries kept alive historical information long suppressed by the Church, namely that Jesus was married to Mary Magdalene; that Jesus and Mary had a female child, and that the descendants of Jesus and Mary are alive in France. Over many centuries, Mary Magdalene became known by many pseudonyms and symbols including the Holy Grail and the rose. As Langdon reports, there have long been rumors that the Priory of Sion has kept watch over the remains of Mary Magdalene and documents establishing Jesus's marriage and child.

Before fleeing from the Louvre with Captain Fache in hot pursuit, Sophie and Langdon discover several mysterious codes, symbols, and other clues left by Sauniere, who clearly had a message of some sort for Sophie. After decoding some of these clues, Sophie locates a laser-cut key on a chain with the symbol of the Priory of Sion in the frame of Madonna of the Rocks by Da Vinci. Following the address written on the key, Sophie and Langdon go to the Paris branch of the Depository Bank of Zurich, where after solving further riddles they are able to figure out the account number for Saunierre's deposit box. In the box they find a beautifully carved wooden box with a rose, with a cryptex inside -- a stone cylinder invented by Da Vinci to store documents safely. The cryptex can only be opened by twisting its five disks -- each with the letters of the alphabet -- to the correct password. The protagonists assume this is the keystone which will contain a map to the location of the Magdalene documents.

After a quick escape from the police facilitated by the head of the bank, Sophie and Langdon seek out the assistance of Sir Leigh Teabing, an eccentric, feisty English lord and authority on the Holy Grail. Both the French police and the albino monk swarm his estate and Teabing saves Sophie and Langdon from an attack by the albino monk and then flies them to London along with the bound monk. All along the three work together to unlock the two-layered cryptex. Teabing expresses strong views that the information regarding Mary Magdalene, once discovered, should be made public and voices a deep antipathy for the Church.

After many twists and turns, it becomes clear that Teabing is the villain, the obsessed "Teacher" who has deceived Opus Dei into

murdering Sauniere and several others in order to find and release the information. Both the Church and Opus Dei, it turns out, are completely innocent of involvement in the crimes committed in the novel. As Teabing is arrested by Captain Fache, Sophie and Langdon finally crack the code for the cryptex. In the end, they are led to the Rosslyn Chapel in Edinburgh, Scotland, where Sophie discovers her grandmother and brother -- reportedly lost in the car crash. From them she learns that she is a descendant of Jesus and Mary Magdalene. At the end of the book, it remains unclear whether the Holy Grail documents exist. Although Robert suspects they are housed beneath the I.M. Pei pyramid at the Louvre, Sophie's grandmother makes clear that the belief in their possibility is far more important than their physical reality. The book ends with Sophie and Langdon expressing the beginnings of some romantic interest in each other.

10.  *The Da Vinci Code* rests on foundations of historical fact and legend involving the Holy Grail, the Priory of Sion, Opus Dei, the Knights Templar, Leonardo Da Vinci's art and symbolism, the Louvre Pyramid, the Gnostic Gospels and the bloodline of Jesus Christ, among other subjects. Brown's ability to weave together these threads into a fast-paced, eminently readable thriller has in no small part accounted for *The Da Vinci Code*'s significant success. Prior to writing the work, Brown conducted extensive research of artwork, architecture, religious documents, rituals and other historical facts and artifacts, much of which found its way into *The Da Vinci Code*. In addition to such research, Brown met with historians and other academics and traveled to the Vatican, France, England and other locations in order to investigate the historical underpinnings of his novel.

11.  *The Da Vinci Code* was published by Doubleday, an imprint of Random House, in or about March 2003.

12.  Brown holds a valid copyright in and to *The Da Vinci Code*. A certificate of registration is attached hereto and incorporated herein as Exhibit A.

13.  *The Da Vinci Code* struck a chord with readers and immediately became an enormous critical and popular success. The book debuted at #1 on *The New York Times*

bestseller list and has remained on the list for the past 77 weeks. The book has been re-printed many times and has sold over 8 million hardcover copies in the United States and Canada, making it one of the fastest-selling adult books of all time and one of the best-selling novels ever. It has so far been translated into 28 languages and has become an international sensation.

14. *The Da Vinci Code* has also garnered critical acclaim. Upon its release, Janet Maslin of *The New York Times* heralded the "blockbuster perfection" of this "exhilaratingly brainy thriller". *The Library Journal*, among others, deemed *The Da Vinci Code* a "masterpiece". Glowing reviews also appeared in *The Washington Post, The San Francisco Chronicle, The Chicago Tribune, The Boston Globe, The Christian Science Monitor* and many other publications.

15. A literary success of this magnitude has also generated significant press coverage. Brown was interviewed on The Today Show, Good Morning America, National Public Radio, Voice of America, CNN Sunday Morning and countless other media venues. The success of *The Da Vinci Code* drew attention to Brown's previous novels, driving those books as well onto *The New York Times* bestseller lists, so that Brown's four novels all appeared on the lists in early 2004.

16. In or about June 2003, Brown licensed the motion picture rights to *The Da Vinci Code* to Columbia Pictures. Ron Howard is slated to direct the movie and a screenplay for the film is underway.

17. In several weeks, Random House is about to publish a special illustrated edition of *The Da Vinci Code*. This illustrated edition reprints the entire work along with many of the historical documents and paintings referenced in the book.

### Defendant's Scheme to Promote Sales of His Works By Repeated and Spurious Claims of Plagiarism and Infringement

18.  Perdue has published about ten novels. On information and belief, prior to the success of *The Da Vinci Code* and Perdue's calculated campaign to falsely link his works to *The Da Vinci Code*, none of Perdue's books achieved significant commercial success or appeared on bestseller lists. In 2003, the year *The Da Vinci Code* was originally published, most of Perdue's previously published works were not even in print. Thus, premised on false claims that *The Da Vinci Code* has misappropriated protected material from two of his books, Perdue embarked on a scheme to, first, link his books to *The Da Vinci Code* and thereby promote sales of his works beyond anything they had ever before achieved and, then, file a copyright infringement suit against Brown and his publisher to further disseminate his unfounded claims.

19.  Perdue relies on two of his books to support his unfounded copyright claims, *The Da Vinci Legacy* and *Daughter of God*. *Legacy* was originally published in 1983 by Pinnacle Books, Inc. On information and belief, sometime after its original publication, *Legacy* went out of print and after that was largely unavailable to the public. However, on the heels of *The Da Vinci Code*'s success, and in a deliberate attempt by Perdue to exploit the false association he created between the works, *Legacy* was reissued and a mass market edition was published in early 2004 by Tor, owned by St. Martin's Press, LLC. On information and belief, the mass market edition of *Legacy* is updated and the protagonist's name is different, among other changes made.

20.  *Legacy* as published in 1983 is set in California, Italy and Lake Como and tells the following story:

> The main protagonist of *The Da Vinci Legacy* is Curtis Davis, a free-spirited, principled renegade. Curtis is an exploration geologist for Continental Pacific Oil, headquartered in California, and along with the company's owner, Harrison Kingsbury, an

amateur Da Vinci scholar. With Curtis's guidance, Kingsbury acquires a portion of Da Vinci's writings. Curtis discovers that two pages of the manuscript are a forgery, dating from shortly after Da Vinci's death, that were designed to cover up a missing section of the manuscript. He makes this discovery by comparing the manuscript with a log of Da Vinci's writings prepared by Antonio de Beatis in the early 1500's, now located in the national library in Madrid. Kingsbury launches Curtis on a quest to determine the reason for the cover-up and he takes off for Europe.

Several scholars who saw the Beatis log -- now mysteriously missing -- are then murdered. A priest pulls a gun on Curtis, who escapes. In Italy for a Da Vinci conference, Curtis begins a romantic relationship with Suzanne Storm, a snooty columnist from Haute Culture magazine. She joins him in his journey.

After many chases, shootings and love scenes, mostly located in Italy and Lake Como, the reader begins to understand that there are two evil entities working in cohoots to obtain possession of the missing pages, which are in the Pope's possession. The Elect Brothers of St. Peter, headquartered in Lake Como, have long been at odds with the Catholic Church and their ultimate goal is to displace the Pope. Over many centuries, they have served as a hide-away for individuals thought to be dead, including Hitler and his Nazi brethren. At the end of his life, Beatis also disappeared into the Brotherhood after stealing most of Da Vinci's papers, which the Brotherhood has used for centuries to help individuals like Krupp develop weapons. For centuries they also have kidnapped and drugged accomplished scientists, scholars and other individuals (including Mozart), and forced them to apply their labors to projects of the Elect Brothers. The Elect Brothers are aware that the missing pages from Da Vinci's manuscript contain concepts that would help create a charged particle beam weapon -- a weapon of mass destruction of terrifying proportions. They want to gain possession of the papers to gain power over the Pope.

The Elect Brothers have formed an alliance with the Legation Brethren, a coalition of evil corporate leaders. One of their representatives is James Elliot Kimball IV, a psychopath from a pampered Ivy League background. The Elect Brothers and Kimball hire a Turkish assassin to kill the Pope, so that they can take advantage of the confusion to steal the missing Da Vinci papers.

In the end, Curtis and Suzanne Storm -- who turns out to be an ex-CIA agent -- foil the evil plot. They distract the assassin as he tries to kill the Pope. After Kimball kills the head of the Elect Brothers and is about to give the missing Da Vinci manuscript to the KGB,

Curtis and Storm eventually kill Kimball. Curtis uses all the documents maintained by the Legation Brethren to root out corrupt American officials.

21. Perdue is also the author of a novel called *The Linz Testament* that was published by Pinnacle Books in 1985. On information and belief, *The Linz Testament* also went out of print. Some time thereafter, upon information and belief, Perdue reworked *The Linz Testament* into what became a new novel called *Daughter of God*. *Daughter of God* was originally published in hardcover by Forge Books, an imprint of St. Martin's Press LLC, in 2000, and in mass market paperback in May 2001. On information and belief, *Daughter of God* is an updated and revised version of *The Linz Testament*.

22. The plot of *Daughter of God* is as follows:

> *Daughter of God* is set in California, Zurich, Amsterdam and Austria. Its villains are the Russians, the Nazis and a Cardinal determined to become Pope.
>
> In the opening scenes of the book, Zoe, an art assessor and broker, and her husband Seth, an ex-cop with gunshot wounds turned professor of philosophy and comparative religion, are brought to Zurich to assess the stupendous art collection of Willi Max, a former Nazi who -- on his deathbed -- wants to return the stolen art to the owners and their families. Max gives them a small painting by a Nazi artist named Stahl and a document which is apparently from the lost writings of Constantine's biographer.
>
> The document reveals the existence of a second Messiah named Sophia who lived in a tiny remote village in modern-day Turkey in 325 A.D. After Sophia's fame spread, the Church interviewed and then killed her entire village and buried everyone in shrouds. Sophia disappeared from her shroud, leaving her image imprinted on it. Later we learn that Hitler gained possession of the shroud and the Passion of Sophia (the story of her life) and bribed the Vatican into silence regarding the Nazi's atrocities by agreeing to keep them secret. Hitler hid these materials in salt mines in Austria.
>
> A corrupt Russian government, working in cahoots with the Russian mafia, steals Willi Max's art, burns down his house, and kidnaps Zoe. Her husband Seth, despondent over the disappearance of his beloved and attractive wife, is attacked in a

furious gunfight on his sailboat in Marina del Ray after learning that the Stahl painting contains some as-yet-undetermined link to the Sophia materials. As he flees, he is assisted by George Stratton, purportedly of the U.S. National Security Agency. Eventually the reader learns that the Russians are looking for the "Sophia" shroud and Passion to gain power over the church. At the same time, Cardinal Braun is determined to defeat a reform group within the church trying to bring them to the light of day.

While Zoe is escaping from the Russians with Stratton's aid, Seth goes on a wild journey through Amsterdam and Zurich, featuring multiple gunfights with mysterious assailants (many Russian), in his quest to find his wife. Eventually reunited, they bring the Stahl painting to a Zurich bank where bank officials use turpentine to remove the paint, revealing a gold ingot with Herman Goering's account number and safe deposit key. In the box are documents leading to the Sophia cache and instructions on how to dismantle the many mines and other weapons in the salt mine. After nearly being killed at the bank, Seth and Zoe, along with Stratton, join forces with Father Morgen, a priest active in the resistance during the Nazi era who is determined to reveal the truth. Together they crawl through tunnels to the heavily fortified salt mine and find the shroud and The Passion of Sophia in a jeweled box. Stratton then turns on them, and escapes with the box, which he brings to his true boss Cardinal Braun, who then blackmails the Pope into appointing him as his successor -- Braun's true goal. As Cardinal Braun is setting off for Rome, Seth, Zoe and Father Morgen land on his roof via helicopter and attack him. Father Morgen reveals to Cardinal Braun that Braun is his illegitimate son. Braun dies after leaping into a fire to regain possession of the Sophia shroud.

23. As is readily apparent from the descriptions of Brown's *The Da Vinci Code* and Perdue's *The Da Vinci Legacy* and *Daughter of God* -- and even more evident when each book is read and compared -- *The Da Vinci Code* is not substantially similar to either *Legacy* or *Daughter of God* and shares no protectable elements from either work. In fact, prior to writing and publishing *The Da Vinci Code*, and to this date, Dan Brown has never read any of Perdue's books, including *Legacy*, *The Linz Testament* or *Daughter of God*.

### Perdue's Campaign to Disseminate Claims of Alleged Copyright Infringement

24. On May 28, 2003, shortly after publication of *The Da Vinci Code*, Perdue wrote

to Stephen Rubin, Publisher of Doubleday, the Random House division under which the work was published, to first assert his claim of alleged copyright infringement. Perdue claimed that *The Da Vinci Code* was strikingly similar to his novel, *Daughter of God,* and enclosed an analysis of the supposed "duplications and similarities" between the two works. Without citing any specifics, Perdue also claimed that *The Da Vinci Code* was similar to *Legacy*.

25. On or about June 16, 2003, Katherine J. Trager ("Trager"), Senior Vice President Secretary and General Counsel of Random House, Inc., responded to Perdue's May 28 letter. She stated unequivocally that Brown did not know Perdue and had not read his books, including *Daughter of God* or *Legacy*. Further, having read *Daughter of God* and reviewed Perdue's supposed comparison of that novel with *The Da Vinci Code*, Trager informed Perdue that she saw no basis for a claim of copyright infringement. Apart from the limited ideas, scenes a faire and historical facts shared by the two works -- and many other novels -- the two books are entirely distinct in plot composition, character development, setting and narrative style.

26. With his letter to Doubleday as his foundation, over the next year Perdue and his agents mounted a press campaign -- involving press releases and other contacts with the media -- in a concerted effort to widely disseminate his false claims of plagiarism and copyright infringement. A consistent refrain in this press campaign was Perdue's assertion that he intended to sue Brown and Random House for copyright infringement. On information and belief, Perdue contacted news organizations in New York and elsewhere to press his claims and threats of litigation. As a result of his concerted campaign, articles recounting his charges and threats of litigation appeared in *The New York Times, The New York Post, The New York Sun, San Francisco Chronicle, Newsweek, Cornell Alumni Magazine* and other publications. Perdue's concerted campaign to give voice to his accusations and to falsely create a link between *The Da Vinci Code* and his two books, *Daughter of God* and *Legacy*, was calculated to increase interest

in his books and to have the books enjoy a "second life" because of the publicity.

27. As a companion to his press accusations, Perdue also launched an Internet campaign to further disseminate his accusations on his own websites (www.ideaworx.com; www.davincilegacy.com; www.daughter-of-god.com) and in postings on other websites (www.oursbrun.com/blog/archives/000070.html). Over the next year, Perdue catalogued his retention of litigation counsel, the hiring of expert witnesses and the development of his impending litigation.

28. On information and belief, Perdue's campaign to falsely associate his works with *The Da Vinci Code* and to trade on its phenomenal success had its intended effect: *Legacy* was reissued in early 2004 and, along with *Daughter of God*, saw significant increases in sales, particularly in New York, and, on information and belief, for the first time a Perdue work even reached *The New York Times* bestseller list. In addition, as a result of his campaign, Perdue successfully sold an option to acquire film rights to his two books.

29. With his press and internet campaign having largely run its course, Perdue again pressed his threats of imminent litigation against Brown and Random House. On or about September 2, 2004, counsel for Perdue wrote Trager and Brown's attorney. This letter stated that both counsel and an expert retained by Perdue, John Olsson, had reviewed and analyzed the works and concluded that Perdue had "substantial claims" against Random House and Brown for infringement of his copyrights in and to *Daughter of God* and *Legacy*. The letter enclosed a report prepared by Olsson identifying supposed similarities between the works and revealing a supposed "smoking gun" of the alleged copying as follows: In *Daughter of God* Perdue made an alleged factual error by referring to Leonardo Da Vinci's Codex Leicester as having been written on "parchment," rather than linen. According to Perdue and his expert, Brown repeats this error in *The Da Vinci Code* -- an error, they claim, that has not been made anywhere else except in

these two works.

30. The catalogue of supposed similarities among the works identified by Perdue's expert is largely based on gross mischaracterizations of the content of the respective works. Alleged similarities that do not rely on distortions of the books either fail to rise above stock elements common to novels, particularly thrillers, or reflect well-documented historical facts or legends. Moreover, the alleged "smoking gun" is without powder: Perdue is far from alone in making the commonsensical assertion that Da Vinci's Codex Leicester was written on "parchment," rather than linen. Indeed, this "error" has been made by art curators and has been reported elsewhere in news articles and other publications, pre-dating the publication of both *The Da Vinci Legacy* and *Daughter of God*.

31. The September 2, 2004 letter gave notice of Perdue's intention to commence an action for copyright infringement in the immediate future if Brown and Random House declined to settle the matter or indicate an attempt to settle by September 13, 2004.

32. Perdue's charges of plagiarism and copyright infringement have raised questions about plaintiffs' rights in and to *The Da Vinci Code* and have caused people to question the legitimacy of Brown's authorship of the work, impairing plaintiffs' ability to exploit their rights in the work.

33. Brown and Random House have not copied Perdue's books or any element of the books Perdue has identified, nor are the protectible elements of the two authors' works remotely, let alone substantially or strikingly, similar. In short, *The Da Vinci Code* does not violate defendant's copyrights or any other rights he holds in the works.

### AS AND FOR A FIRST CLAIM FOR RELIEF
**(Declaratory Judgment pursuant to 28 U.S.C. §2201(a))**

34. Plaintiffs repeat and reallege Paragraphs 1 through 33 of this Complaint.

35. The dispute created by defendant's repeated claims to the media and directly to plaintiffs is an actual, substantial and justiciable controversy between the parties requiring resolution by the Court.

36. Defendant and his agents contend that Brown copied his works, claim that plaintiffs' authorship and publication of *The Da Vinci Code* infringes his copyrights in and to *Daughter of God* and *The Da Vinci Legacy*, including any predecessor works; and have expressly stated their intention to commence an action for copyright infringement in the immediate future absent a settlement.

37. Plaintiffs contend that Brown had never read any of Perdue's books prior to the publication of *The Da Vinci Code*; that any similarities between *The Da Vinci Code* and defendant's works are mere similarities of ideas, material in the public domain, scenes a faires and fact and/or are trivial and *de minimis*; and that they have not infringed defendant's copyrights in his works, nor does the publication of *The Da Vinci Code* otherwise violate defendant's rights.

38. Failure to resolve the parties' dispute by declaring that *The Da Vinci Code* does not infringe either *Daughter of God* or *The Da Vinci Legacy* will permit a controversy to remain over plaintiffs' rights to continue publication of the works, will continue to allow people to question the legitimacy of Brown's authorship of the work, and will impair the ability to fully exploit their rights.

39. To resolve this actual controversy, plaintiffs seek a declaration and judgment that their authorship, publication and exploitation of rights in and to *The Da Vinci Code* has not infringed the copyrights of Perdue or any person owning rights in and to *Daughter of God* or *The Da Vinci Legacy*, or any prior edition or version of those works, including *The Linz Testament* or otherwise violated Perdue's and/or his licensees' and assignees' rights.

## PRAYER FOR RELIEF

Wherefore, plaintiffs pray for judgment as follows:

1. A declaration that plaintiffs' authorship, publication and exploitation of rights in and to *The Da Vinci Code* has not in any way infringed the copyrights of defendant or any person owning rights in and to *Daughter of God* or *The Da Vinci Legacy* or any prior edition or version of these works, including *The Linz Testament*, or otherwise violated the rights of Perdue and his licensees and assignees.

2. An award of plaintiffs' costs and attorney's fees in connection with this action.

3. Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
September 17, 2004

DAVIS WRIGHT TREMAINE LLP

By: _____
Elizabeth McNamara (EAM 1987)
Linda Steinman (LJS 5906)
James Rosenfeld (JR 2256)

1633 Broadway
New York, New York 10019-6708
Phone (212) 489-8230
Fax (212) 489-8340

Attorneys for Plaintiffs
Dan Brown and Random House, Inc.

Of Counsel:

Michael I. Rudell
Katherine J. Trager

A

**CERTIFICATE OF REGISTRATION**



OFFICIAL SEAL

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
United States of America

FORM TX
UNITED STATES COPYRIGHT OFFICE
REGISTRATION NUMBER

**TX 5-731-466**

EFFECTIVE DATE OF REGISTRATION

Month Apr  Day 3  Year 2003

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1** TITLE OF THIS WORK ▼

THE DA VINCI CODE

PREVIOUS OR ALTERNATIVE TITLES ▼

PUBLICATION AS A CONTRIBUTION  If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.  Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼   Number ▼   Issue Date ▼   On Pages ▼

**2** NAME OF AUTHOR ▼
a   Dan Brown

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ U.S.
    { Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No

NOTE
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼
entire text

NAME OF AUTHOR ▼
b

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
    { Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼

NAME OF AUTHOR ▼
c

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
    { Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼

**3** a YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED  This information must be given in all cases.
2002 ◀ Year

b DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK  Complete this information ONLY if this work has been published.
Month ▶ March  Day ▶ 18  Year ▶ 2003
U.S. ◀ Nation

**4** COPYRIGHT CLAIMANT(S)  Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Dan Brown
c/o Sanford Greenburger Associates
55 Fifth Ave.
NY, NY 10003

See instructions before completing this space

APPLICATION RECEIVED
APR 0 3 2003
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
APR 0 3 2003
REMITTANCE NUMBER AND DATE

TRANSFER  If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

DO NOT WRITE HERE OFFICE USE ONLY

MORE ON BACK ▶ • Complete all applicable spaces (numbers 5-11) on the reverse side of this page.
• See detailed instructions.          • Sign the form at line 10.

DO NOT WRITE HERE
Page 1 of 2 pages

|  | EXAMINED BY ☐ | FORM TX |
|---|---|---|
|  | CHECKED BY |  |
|  | ☐ CORRESPONDENCE<br>Yes | FOR<br>COPYRIGHT<br>OFFICE<br>USE<br>ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼
☐ This is the first published edition of a work previously registered in unpublished form.
☐ This is the first application submitted by this author as copyright claimant.
☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▼       Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.
a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**

See instructions before completing this space.

—space deleted—

**7**

**REPRODUCTION FOR USE OF BLIND OR PHYSICALLY HANDICAPPED INDIVIDUALS** A signature on this form at space 10, and a check in one of the boxes here in space 8, constitutes a non-exclusive grant of permission to the Library of Congress to reproduce and distribute solely for the blind and physically handicapped and under the conditions and limitations prescribed by the regulations of the Copyright Office: (1) copies of the work identified in space 1 of this application in Braille (or similar tactile symbols); or (2) phonorecords embodying a fixation of a reading of that work; or (3) both.
a ☒ Copies and Phonorecords        b ☐ Copies Only        c ☐ Phonorecords Only

**8**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼  Doubleday & Company, Inc.        Account Number ▼  21822

**9**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼
Carol Christiansen (212-782-8957)
Bantam Doubleday Dell Publishing Group, Inc.
1745 Broadway
N.Y., N.Y. 10019
                    Area Code & Telephone Number ▶

Be sure to give your daytime phone number

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of  Dan Brown
      Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**10**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Carol Christiansen                date ▶ 3/28/03

Handwritten signature (X) ▼
*/s/ Carol Christiansen*

**11**

| MAIL<br>CERTIFI-<br>CATE TO | Name ▼ CAROL CHRISTIANSEN<br>BANTAM DOUBLEDAY DELL PUBLISHING GROUP |
|---|---|
| Certificate<br>will be<br>mailed in<br>window<br>envelope | Number/Street/Apartment Number ▼<br>1745 BROADWAY<br>City/State/ZIP ▼<br>NEW YORK, NEW YORK 10019 |

• Complete all necessary spaces
• Sign your application in space 10

1. Application form
2. Nonrefundable $20 filing fee in check or money order payable to Register of Copyrights
3. Deposit material

Register of Copyrights
Library of Congress
Washington, D.C. 20559

* 17 USC § 506(e) Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

☆U.S. GOVERNMENT PRINTING OFFICE: 1991—282-170/20,010