UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

DAN BROWN and RANDOM HOUSE, INC.,

                Plaintiffs,

    -against-

LEWIS PERDUE,

               Defendant.

04 Civ. 7417 (GBD)

<u>MEMORANDUM OPINION
AND ORDER</u>

-----------------------------------------------------------------x

LEWIS PERDUE,

              Counterclaimant,

    -against-

DAN BROWN and RANDOM HOUSE, INC.,
COLUMBIA PICTURES INDUSTRIES, INC.,
SONY PICTURES ENTERTAINMENT INC.,
SONY PICTURES RELEASING CORPORATION,
IMAGINE FILMS ENTERTAINMENT, LLC,

            Counterclaim Defendants.

-----------------------------------------------------------------x

GEORGE B. DANIELS, District Judge;

       Plaintiffs Dan Brown and Random House, Inc. bring suit seeking declaratory judgment that the book, *The Da Vinci Code*, does not infringe the copyrights defendant Lewis Perdue owns in his books, *Daughter of God* and *The Da Vinci Legacy*. Defendant asserted counterclaims alleging copyright infringement against plaintiffs and other counterclaim defendants.

       Plaintiffs submitted a motion for judgment on the pleadings, or in the alternative, for summary judgment on their declaratory judgment claim. Defendant also moved for summary judgment on his counterclaims. The Court finds that there is no substantial similarity between Brown's book *The Da Vinci Code* and Lewis Perdue's books *Daughter of God* and *The Da Vinci Legacy*. Accordingly, defendant's motion for summary judgment is denied and plaintiffs' motion

for summary judgment on their declaratory judgment claim is granted.

## BACKGROUND

This is an action for copyright infringement under the Copyright Act of 1976, *as amended*, 17 U.S.C. §§ 101 *et seq.* (1994). Lewis Perdue claims that Dan Brown's novel, *The Da Vinci Code*, infringes upon copyrights he owns in *Daughter of God* and *The Da Vinci Legacy*.[1] Brown, who initiated this lawsuit, seeks a declaratory judgment that his work does not infringe upon Perdue's. Perdue counterclaimed, and included as counterclaim-defendants various parties associated with production of the anticipated motion picture version of Brown's *The Da Vinci Code*. Along with his copyright infringement claim, Perdue alleges unjust enrichment, and seeks an accounting of all income deriving from *The Da Vinci Code*, as well as a permanent injunction barring the distribution of the book and the motion picture adaptation. He demands damages totaling $150 million.

The threshold issue for deciding whether *The Da Vinci Code* infringes on copyrights in *Daughter of God* and *The Da Vinci Legacy* involves a determination of whether the works are "substantially similar." This determination requires a "detailed examination of the works themselves." Walker v. Time Life Films, Inc., 784 F.2d 44, 49 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986).

### A. *The Da Vinci Code*

*The Da Vinci Code*[2] begins with the murder of Jacques Sauniere, the curator of the

---

[1] *The Da Vinci Code* was published by Doubleday, a division of defendant Random House, in March 2003. *The Da Vinci Legacy* was published in 1983 and *Daughter of God* was published in 2000.

[2] The synopsis of *The Da Vinci Code* from its book jacket is as follows:

Louvre Museum, by an albino monk seeking the Holy Grail. The monk is a member of Opus Dei, a devout Catholic sect headed by Bishop Aringarosa, but is acting at the direction of a mysterious and unknown figure known simply as the "Teacher." Before dying, Sauniere leaves behind a series of clues meant for his estranged granddaughter, including disrobing and placing himself, before his death, in the position of Da Vinci's Vitruvian Man and writing a note that read "P.S. Find Robert Langdon." Langdon, a Harvard professor of religious symbology, is summoned to the Louvre by Bezu Fache, captain of the French judicial police, under the guise of helping to solve the crime. Fache, however, suspects that Langdon is involved with the murder. Also present at the crime scene is Sophie Neveu, a police cryptologist and granddaughter of the victim. Neveu recognizes that the inscription "P.S. Find Robert Langdon," is a message to her (P.S. stood for Princess Sophie). She warns Langdon that he is in danger and that he is suspected by the police of being the killer.

Langdon and Neveu fake an escape from the Louvre, buying them enough time to further

---

While in Paris on business, Harvard symbologist Robert Langdon receives an urgent late-night phone call: the elderly curator of the Louvre has been murdered inside the museum. Near the body, police have found a baffling cipher. While working to solve the enigmatic riddle, Langdon is stunned to discover it leads to a trail of clues hidden in the works of Da Vinci -- clues visible for all to see -- yet ingeniously disguised by the painter.

Langdon joins forces with a gifted French cryptologist, Sophie Neveu, and learns the late curator was involved in the Priory of Sion -- an actual secret society whose members included Sir Isaac Newton, Botticelli, Victor Hugo, and Da Vinci, among others.

In a breathless race through Paris, London, and beyond, Langdon and Neveu match wits with a faceless powerbroker who seems to anticipate their every move. Unless Langdon and Neveu can decipher the labyrinthine puzzle in time, the Priory's ancient secret -- and an explosive historical truth -- will be lost forever.

*The Da Vinci Code* heralds the arrival of a new breed of lightning-paced, intelligent thriller utterly unpredictable right up to its stunning conclusion.

dissect and unravel the clues and riddles Sauniere left behind.   Using the Fibonacci numerical sequence, the couple determine that a poem left by Sauniere was an anagram of "Leonardo da Vinci!  The Mona Lisa!"  Neveu and Langdon follow Sauniere's clues to a key with a symbol of the Priory of Sion hidden in the frame of "Madonna of the Rocks," a painting by Leonardo da Vinci who himself served as a Grand Master of the Priory of Sion.  Neveu and Langdon are led to the Paris branch of the Depository Bank of Zurich where they are presented with yet more riddles.  Solving these riddles allows Neveu and Langdon to determine the account number for Sauniere's deposit box, where they discover a carved wooden box with a cryptex - a stone cylinder invented by Da Vinci to store objects safely, which can only be opened with a proper password.

The reader learns through Langdon, who serves as an intellectual catalyst and religious historian of the novel, that Sauniere was the Grand Master of a secret society named the Priory of Sion, an organization founded centuries ago and charged with keeping the secret of the Holy Grail.  The secret of the Holy Grail is the secret of the divine feminine; that Mary Magdalene was married to Jesus and that they had offspring.  Through the years, the Priory of Sion protected this information and guarded the fact that Jesus and Mary Magdalene's bloodline still survives through their descendants.

Although the police converge on the bank, Langdon and Neveu escape with the help of the bank president, who was an old friend of Sauniere.  They seek refuge at the home of Sir Leigh Teabing, the wealthy Royal Historian and authority on the Holy Grail.  Teabing, portly and ruby faced, suffers from polio and walks with the help of aluminum braces and crutches. Teabing provides a tutorial on the legend of the Grail, shares religious history, and offers

evidence that Jesus and Mary Magdalene were married and had a child. He also shares with them clues in Da Vinci's artwork of Mary Magdalene's role in early Christianity.

Teabing's home, however, serves only as a temporary refuge, as both the albino monk and the French police track Langdon and Neveu to Teabing's estate. The monk attacks, demanding the cryptex, but with Teabing's help, the monk is subdued and Teabing, his servant Remy, Neveu and Langdon flee from his estate to the airport, where they board Teabing's private jet and head for London. During the flight, Langdon, Neveu and Teabing work together to determine the password that would unlock the cryptex. They believe that locked inside the cryptex is the location of the Holy Grail.

In London, Langdon, Neveu and Teabing search for clues to help them determine the password. The albino monk, through the help of Teabing's traitorous servant Remy, gets free, steals the cryptex from Langdon and Neveu and kidnaps Teabing. It is soon learned that Teabing is the "Teacher" and that he deceived Opus Dei into murdering Sauniere and the other Priory masters because he is obsessed with finding and releasing to the public the secret of the Holy Grail. Instead of killing Langdon and Neveu, Teabing implores Langdon to assist him in solving the password to open the cryptex. Langdon, having already determined the password and removed the contents of the cryptex, throws the cryptex in the air, presumably to destroy it. Teabing leaps to save it and falls to the ground as Fache and the police enter the room. Fache arrests Teabing, and Langdon reveals that he knew the password and saved the contents of the cryptex.

The cryptex, in fact, did not contain a map, but rather another riddle that leads Langdon and Neveu to Rosslyn Chapel in Scotland, where Neveu is reunited with her grandmother and brother, whom she thought had died long ago in a car crash. She learns that she is a descendant

of Jesus and Mary Magdalene. Neveu's grandmother, during a conversation with Langdon, reveals that the possibility of the existence of the documents and proof is far more important than their actual existence. Neveu invites Langdon to stay. Although he refuses, they make plans to meet again in the near future and the two share an intimate kiss. In a final epilogue, Langdon realizes that the documents and other objects concerning Mary Magdalene are safely hidden underground in an inverted pyramid at the Louvre.

### B. *Daughter of God*

At the opening of *Daughter of God*,[3] two Americans, Zoe Ridgeway, an art assessor and broker, and her husband Seth Ridgeway, an ex-police officer turned professor of philosophy and comparative religion, are invited to Zurich by Willi Max, an elderly former Nazi. Faced with imminent death and suffocating guilt, Max wishes to return his vast collection of art, which he stole from Jews during World War II, to their rightful owners. He asks Zoe to assist him in this task.

After their meeting, Max sends to Zoe's hotel a document purportedly to be one of the many lost writings of Emperor Constantine's biographer, Eusebius. The document tells the story of a second Messiah named Sophia who lived in a small remote village during the fourth century A.D. Unbeknownst to Zoe, Max has also sent to her hotel a small painting by a German artist named Frederick Stahl which the reader later learns, is the key to finding evidence to prove her existence. Sophia was an illegitimate child born into a family of merchants and was raised in

---

[3] The synopsis of *Daughter of God*, as revealed on its back cover, reads:
A FEMALE MESSIAH?
When Zoe Ridgeway, a prominent art broker, visits Switzerland with her husband Seth, she expects to purchase the rich estate of a secretive art collector. But before Zoe can complete the transaction, she and Seth are drawn into a thousand-year-old web of conspiracy, murder, and intrigue that begins and ends with the mystery of a female Messiah, a young girl whose existence, if proven, would explode the very foundation of Western culture.

isolation until she was a teenager, when she began healing people with her touch. When the reports of her existence and the miracles she performed reached Rome, the Church, fearful of her growing following, brought Sophia and all the members of her village to Byzantium and interviewed them. After the interviews, the Romans killed them all, including the scribe responsible for recording the interviews. The Church wrapped all the victims in shrouds and buried them in a mass tomb in a cave. A week later, when the Romans went to inspect the tomb, one of the shrouds was empty, but contained the image of a fifteen year old girl, Sophia. Centuries later, Hitler gained possession of the sacred shroud, the Passion of Sophia (the story of her life), and other documents that explained her divinity. Hitler used these materials to bribe the Vatican into silence regarding Nazi atrocities. Hitler then hid all the materials in Austrian salt mines.

The story returns to the present day, where a few powerful groups are found vying for possession of the Sophia materials. The reader learns that KGB officials and the Russian mafia, believing that Willi Max has possession of materials that can lead to the Sophia materials, steal Max's art, kill Max, burn down his house, and kidnap Zoe. The Russians believe that the Sophia materials can help them gain more power and wish to use the materials to blackmail the Russian Orthodox Church. Another group, led by Cardinal Neils Braun, a former archbishop of Vienna and the head of a secretive, powerful Vatican intelligence force called the Congregation for the Doctrine of the Faith ("CDF"), also seeks possession of the Shroud. He intends to use the materials to become the next pope. Cardinal Braun tells an unnamed American about the second Messiah, and asks for the American's assistance in securing the shroud and related documents.

The story then flashes back to Seth Ridgeway, who, unable to find his wife, retreats to California despondent over his wife's disappearance. Seth is seen barely working, drinking, and

spending a lot of time on his boat. He is visited by an unknown woman who reveals that the Stahl painting Max had sent to their Zurich hotel before Zoe's kidnaping may help to explain his wife's disappearance and lead him to her location. Suddenly, the boat is attacked and destroyed by unidentified gunmen. Seth escapes and finds help from George Stratten, an officer of the United States National Security Agency. Seth realizes that the painting may be in his unopened mail at UCLA. He slips away from the NSA agents assigned to watch him, retrieves the painting and leaves for Europe in search of his wife.

Meanwhile, in Europe, Zoe is held captive by the Russians in a warehouse. Over a period of a few months, she is interrogated about the painting and forced to help the Russians value their stolen art. Also held captive is a fellow art connoisseur who teaches her about the history of the "Great Goddess," and the presence of divine feminine elements in the world's religions and art. It is through their conversations that the history of the divine feminine is shared. Zoe manages to escape from the Russians and is met by the NSA's Stratton who brings her to a Zurich hotel. Seth, meanwhile, arrives in Europe and while traveling through Amsterdam and Zurich, engages in multiple gunfights with unknown assailants, at least some of them Russian. He manages to arrive at the same hotel where Zoe is staying, and they are reunited.

Together, Zoe and Seth bring the Stahl painting to a Zurich bank where bank officials use turpentine to remove the paint, revealing a gold ingot with Herman Goering's account number and safe deposit key. In Goering's safe deposit box are documents leading to the Sophia materials and instructions on how to dismantle the many traps in the salt mine where the Sophia materials are located. After another gun battle, Seth, Zoe and Stratton go to the Austrian town of Alt Aussee, where they join forces with Father Hans Morgan, a priest active in the Nazi resistance who now serves as a Church reformer determined to reveal the truth concerning

Sophia.

Zoe, Seth, Stratton, Morgan and others crawl through the mineshafts to the heavily fortified salt mine and find the shroud and the Passion of the Sophia in a jeweled box deep within the mine. Stratton, revealed as the unknown American who had promised to help Cardinal Braun recover the shroud, steals and escapes with the jeweled box. He brings it to Cardinal Braun, his true master, who intends to use it to blackmail the current Pope into stepping down and appointing him the successor. Just as Braun is preparing to head to Rome, Seth, Zoe and Morgen arrive at Braun's chalet and attack him. Father Morgan reveals to Braun that the Cardinal is his illegitimate son. Braun, caring only about the Shroud, dies after leaping into a fire to try and save it. In a role reversal, Zoe tells Seth that God has been good to them and that Seth should renew his lapsed faith. Prior to their ordeal, it was Seth who attempted to instill faith in Zoe. They learn that as a result of the fire at Braun's retreat, the entire structure burned except for portion of the floor in the shape of a woman where Sophia's shroud had last been.[4]

---

[4] Although Perdue also asserts infringement of his earlier novel, *The Da Vinci Legacy*, he offers no arguments in his moving papers in support of his claims. He argues that his "copyright infringement claims in this action are based primarily on *Daughter of God*" and that "Legacy is mentioned because Brown also plagiarized many elements of Legacy in writing *Da Vinci Code*." Perdue's Memorandum of Law at 1. Indeed, despite his later pronouncement during oral argument that he did not seek to abandon this claim, after reading *The Da Vinci Legacy* and reviewing the parties' arguments, it is clear that any infringement claim based on *The Da Vinci Legacy* also fails to survive Brown's motion for summary judgment. *The Da Vinci Legacy* concerns the quest for missing pages from Leonardo da Vinci's notebooks that contain information necessary to build a charged particle beam weapon. The hero's efforts to locate the missing pages pit him against the corrupt Bremen Legation and the evil Elect Brothers, who seek to construct the weapon. A thorough review of *The Da Vinci Legacy*'s plot, themes, characters and other elements supports a finding of noninfringement. Accordingly, to the extent that defendant Perdue continues to assert a claim of infringement based on *The Da Vinci Legacy*, that claim is also dismissed.

<u>**COPYRIGHT INFRINGEMENT**</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Nebraska v. Wyoming</u>, 507 U.S. 584, 590, 113 S. Ct. 1689, 1694, 123 L. Ed. 2d 317 (1993). The burden of demonstrating that no factual dispute exists is on the moving party. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56 (e). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment should be granted only when no reasonable trier of fact could find in favor of the nonmoving party. <u>Gallo v. Prudential Residential Services, Ltd.</u>, 22 F.3d 1219, 1224 (2d. Cir. 1994).

In order to succeed on a claim of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." <u>Feist Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). In the absence of direct evidence, copying is proven by showing that (1) defendant had access to the copyrighted work, and (2) there is a substantial similarity of expression in the respective works. <u>Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.</u>, 150 F.3d 132, 137 (2d Cir.1998).[5] Perdue's claims, therefore, turns upon a finding of substantial

---

[5] For purposes of their summary judgment motion, plaintiff-counterclaim defendants have conceded that they had access to Perdue's books.

similarity between the two books.  The test for "substantial similarity" is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."  Warner Bros. Inc. v. American Broadcasting Companies, 654 F.2d 204, 208 (2d Cir.1981) (quoting Ideal Toy v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir.1966)).[6]  If the similarity concerns only noncopyrightable elements of a work, or no reasonable trier of fact could find the works substantially similar, summary judgment is appropriate.  Walker v. Time Life Films, 784 F.2d 44, 48 (2d Cir. 1986).

It is "a principle fundamental to copyright law" that "a copyright does not protect an idea, but only the expression of an idea."  Kregos v. Associated Press, 3 F.3d 656, 662 (2d Cir. 1993), cert. denied, 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994).  "The distinction between an idea and its expression is an elusive one."  Id. at 587-588.  Judge Learned Hand, in Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930), provides the guiding principle:

> Upon any work, . . .  a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out.  The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise, the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

Id.  Furthermore, "the line [lies] somewhere between the author's idea and the precise form in which he wrote it down . . . protection covers the 'pattern' of the work . . . the sequence of events, and the development of the interplay of characters."  Hogan v. DC Comics, 48 F.Supp.2d

---

[6] In support of his claims of substantial similarity, Perdue also submits declarations from John Gabriel Olsson, a specialist in forensic linguistics and Gary Goshgarian, a professor of English at Northeastern University.  However, because substantial similarity is judged by the spontaneous response of the ordinary lay observer, expert analysis of the similarities between the two works is not determinative.  See Denker v. Uhry, 820 F.Supp. 722, 729 (S.D.N.Y. Dec. 8, 1992)(finding expert testimony unnecessary to assess substantial similarity if the proffered testimony does not deal with evidence or material that might help gauge the response of the lay reader).

298 (S.D.N.Y. Jan 26, 1999)(citing Z. Chafee, *Reflections on the Law of Copyright*, 45 Colum.L.Rev. 503, 515 (1945)).

Similarly, *scenes a faire*, sequences of events that necessarily result from the choice of a setting or situation, do not enjoy copyright protection. Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996)(quoting Walker, 784 F.2d at 50); see also Hoehling v. Universal City Studios, inc., 618 F.2d 972, 979 (2d Cir. 1980)('incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" are *scenes a faire*). Furthermore, "thematic concepts . . . which necessarily must follow from certain plot situations" are not entitled to copyright protection. Reyher v. Children's Television Workshop, 533 F.2d 87, 91 (2d Cir. 1976).

When a work contains both protectible and unprotectible elements, the Court can only inquire whether "the protectible elements, standing alone, are substantially similar." Williams v. Crichton, 84 F.3d at 588 (quoting Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1002 (2d Cir. 1995). Any dissimilarity between the works will not automatically relieve the infringer of liability as "no copier may defend an act of plagiarism by pointing out how much of the copy he has not pirated." Rogers v. Koons, 960 F.2d 301, 308 (2d Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). The alleged infringer will be found innocent of infringement when the similarities between the protected elements of the copyrighted works and the allegedly infringing work are of small import quantitatively or qualitatively. Id.

## A. Perdue's Specific Claims of Similarity

The *gravamen* of Perdue's complaint is that Brown copied the basic premise underlying *Daughter of God*:

notions of a divine feminine, the unity of male and female in pagan worship, the
importance of Sophia, the "Great Goddess" of the Gnostic Gospels, the fact that history is
relative and is controlled by victors, not losers, the importance of the Roman Emperor
Constantine in requiring a transition from a female to a male dominated religion, as well
as to create a unified religion having a common dogma, the quest not only for physical
objects, but for spiritual fulfillment.

Perdue's Local Rule 56.1 Statement of Undisputed Material Facts, ¶ 153; Perdue's Memorandum

of Law at 5. He further argues that the following elements are common to both books: the role of

the female; the Church's recasting of the great goddess as evil; the role of Emperor Constantine;

Christianity's adoption of pagan practices; the existence of the divine feminine; the heroines'

epiphany regarding the Great Goddess; the physical evidence of the divine feminine; the fact that

there are keepers of the physical evidence; the Catholic Church's awareness of the existence of

the Holy Grail and the Sophia Passion; the existence of two organizations who seek to obtain the

physical evidence; similarities between Opus Dei and the Congregation for the Doctrine of Faith;

the protagonists' unwillingness to participate in the struggle between the competitors to obtain

the physical evidence; the female's equal claim to divinity as males and that through their union,

they become much more than the sum of their parts; the enemy who acts as a wolf in sheep's

clothing; the protagonists' realization that possessing the physical evidence is not as important as

the understanding of what the physical evidence represents; the conclusion that the hero and

heroine are themselves pursued by the quest for the physical evidence; similarities between the

treatment of Mary Magdalene in *The Da Vinci Code* and Sophia in *Daughter of God*; the use of

historical references, particularly Constantine, in both novels; the fact that both novels

incorporate the use of a gold key; the novels' similar discussion of women, the Goddess,

Creation and How God became a male; similar discussions of Mother Earth; the theme that

people create their own gods; and lastly, a similar discussion in both novels regarding

communion.

All of these similarities, however, are unprotectible ideas, historical facts and general themes that do not represent any original elements of Perdue's work. For example, although both novels discuss Emperor Constantine and the Council of Nicea, it is without question that references to historical figures and events constitute unprotectible elements under the copyright laws, as "[n]o claim of copyright protection can arise from the fact that plaintiff has written about such historical and factual items." <u>Alexander v. Haley</u>. 460 F.Supp. 40, 45 (S.D.N.Y. Sept. 21 1978)(citing <u>Rosemont Enterprises, Inc. v. Random House, Inc.</u>, 366 F.2d 303, 309 (2d Cir. 1966). Also, copyright protection does not extend to thematic concepts or scenes which must necessarily follow from similar plot situations. <u>See</u> <u>Reyher</u>, 533 F.2d at 91. Both *Daughter of God* and *The Da Vinci Code* involve the unprotectible *idea* of a mystery thriller set against a religious backdrop. As a mystery thriller, common themes of "the wolf in sheep's clothing," or the theme that "history is relative and is controlled by victors, not losers," or the theme that "through [the union of hero and heroine], they become much more than the sum of their parts," are unprotectible stock themes common to the genre. <u>See</u> <u>Williams v. Crichton</u>, 860 F.Supp. 158, 166 (S.D.N.Y. Aug 17, 1994), *aff'd* <u>Williams v. Crichton</u>, 84 F.3d 581 (2d Cir. 1996) (holding that themes commonly repeated in certain genre are not protectible by copyright as no one can own the basic idea for a story).

Indeed, it is not original in this genre to have a storyline whereby "two organizations or people who would stop at nothing, including murder, to obtain physical evidence," that there are keepers of this physical evidence, or that "the hero and heroine became unwilling participants in the struggle between the competitors to obtain the physical evidence." Furthermore, the fact that the hero and heroine realize that possessing the physical evidence is not as important as the understanding of what the physical evidence represents, or that the reader is led to conclude that

the hero and heroine are themselves pursued by the quest for the physical evidence, offers

nothing new to this type of story. Moreover, because *Daughter of God* and *The Da Vinci Code*

share a religious backdrop, Perdue's claims that the novels share a similar theme that "people

create their own gods," and that both novels have "discussions of Mother Earth" and

"discussions about communion" are not afforded copyright protection. Perdue has not alleged

that his unique *expression* of these ideas and themes were copied. Ideas and general literary

themes themselves are unprotectible under the copyright law.

      Perdue also alleges various discrete similarities between the two plots. However,

although both novels discuss the Catholic Church, such discussion is expected from a thriller

with religious themes and is an unprotectible *scene a faire*. See Williams v. Crichton, 84 F.3d at

587(similar scenic elements are unprotectible *scenes a faire* that follow naturally from the work's

theme rather than the author's creativity). Similarly, Perdue's claims that both novels discuss

Swiss bank accounts and gold keys or that the novels begin with a murder are unprotectible

scenes a faire that precludes a finding of substantial similarity.[7] Perdue's claim that there are

similarities between Opus Dei and the Congregation for the Doctrine of Faith, two real and

existing organizations is also unprotectible. Walker, 784 F.2d at 49 (finding that copyright

protection does not extend to facts).

      A significant part of Perdue's argument focuses on the ideas and broad themes

concerning the divine feminine, the important role of the female in early religion, the importance

of Sophia, the "Great Goddess" of the Gnostic Gospels, and how she was re-cast by the Church

---

     [7] Indeed, although there is clearly a gold key in *The Da Vinci Code*, *Daughter of God* references a "very small *ingot* fixed into a recess of the wood substrate on which the paint had been applied." *Daughter of God* at 312 (emphasis added).

as evil, the unity of male and female in pagan worship and Christianity's adoption of pagan

practices as well as the importance of Emperor Constantine in requiring a transition from a

female to a male dominated religion.  Perdue argues that he "first incorporated these elements in"

an earlier novel titled *Linz Testament* which he "extensively re-worked" into *Daughter of God*.

Perdue's Memo at 5.  A central theme of *The Da Vinci Code* is the suppression of the divine

feminine in the Christian tradition.  He claims that "the material plagiarized in [*The Da Vinci

Code*] consists of an extensive and detailed synthesis of history and multiple schools of theology

that Perdue created for *Daughter* [*of God*] and based on equally unique work expressed in *Linz*

[*Testament*] and [*Da Vinci*] *Legacy*."  Perdue's Facts ¶ 212.

Perdue argues that Brown stole his "synthesis" of differing religious beliefs emanating

from the Gnostic Gospels.  He has made no factual allegations, however, to support a finding that

Brown copied his *expression* of these ideas.  Moreover, these ideas and themes find their origin

in historical facts, events and figures, as well as pre-existing works.  See Hoehling, 618 F.2d at

979 (finding that, despite plaintiff's claim that specific facts, ascertained through his personal

research, were copied, such facts are unprotectible, as defendants "had the right to avail

[themselves] of the facts contained in [plaintiff's] book" and "to use such information, whether

correct or incorrect, in their own work")(citing Greenbie v. Noble, 151 F.Supp. 45, 67 (S.D.N.Y.

1957); see also Alexander, 460 F.Supp. at 45("where common sources exist for the alleged

similarities, or the material that is similar is otherwise not original with the plaintiff, there is no

infringement").  In his Author's note in *Daughter of God*, Perdue himself states that "[t]his is a

work of fiction based on fact. . . . The sections of this book dealing with the Nicean Conference

and the events and religious controversies leading up to it are true and far better documented than

any of the scriptures in the Hebrew or Christian Bible or the Muslim Koran."  *Daughter of God*

at 420. Perdue concedes that "[m]uch of his research [about the sacred feminine and the Great Goddess] involved the Gnostic Gospels, discovered at Nag Hammadi, Egypt in 1945, but not translated until the 1970's, and works commenting upon those Gospels." Perdue's 56.1 Statement, ¶ 156. Furthermore, there is no substantial similarity in the expression of the divine feminine in each book. In *The Da Vinci Code*, the divine feminine is expressed as Mary Magdalene, a true biblical figure, while in *Daughter of God*, the divine feminine figure is Sophia, a fictional second Messiah created by Perdue. As copyright protection "does not extend to facts or to true events, even if they are discovered through original research," Perdue's claims regarding these ideas and themes are unprotectible. Walker, 784 F.2d at 49.

**B.  A Comparison of *The Da Vinci Code* and *Daughter of God***

The critical examination which must be conducted, in order to determine whether *The Da Vinci Code* is substantially similar to *Daughter of God* to support copyright infringement, is a review of relevant similarities between the two works "in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and setting." Williams v. Crichton, 84 F.3d at 588.

**1.  Thematic Expression**

"In its ordinary meaning, a theme is understood to be the underlying thought which impresses the reader of a literary production, or the text of a discourse. Using the word 'theme' in such a sense will draw within the circle of its meaning age-old plots, the property of everyone, and not possible of legal appropriation by an individual." Roe-Lawton v. Hal E. Roach Studios, 18 F.2d 126, 127 (D.C.Cal. 1927). Indeed, thematic concepts which follow from similar plot situations are not afforded protection under the copyright laws. See Smith v. Weinstein, 578 F.Supp. 1297, 1302 (S.D.N.Y. Jan. 24, 1994). General themes expressed in *Daughter of God* are

afforded no copyright protection.  "[T]he essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization."  Reyher, 533 F.2d at 91.

*The Da Vinci Code*'s expression of the divine feminine and its related themes differ markedly from their expression in *Daughter of God*.  In *The Da Vinci Code*, Mary Magdalene represents the Divine Feminine that was suppressed by the Church.  Through Langdon's character, Brown shares with the reader the history and importance of women and the sacred feminine in early religion.  Through Langdon's and Teabing's monologues, Neveu and the reader are introduced to the belief that Mary Magdalene was the wife of Christ and that they produced offspring.  This secret, which the reader is shocked to learn represents the truth of the Holy Grail, was kept protected by a group called the Priory of Sion, whose military arm, the Knights Templar, guarded the secret with their lives.  The reader eventually learns that Neveu is a descendant of Christ and Mary Magdalene.

In *Daughter of God*, a fictional second messiah named Sophia represents the Divine Feminine suppressed by the Church.  Sophia, who existed around 325 A.D. in a remote mountain village near the Anatolian city of Smyrna (in present-day Turkey), was executed by the Romans after news of her miracles hit the Vatican.  An early discussion between Zoe and Seth introduces the reader to Sophia and to Constantine's influence on the early church.  Sophia's history is further shared through one of the villains, Cardinal Braun, who discusses it with NSA Agent Stratton, while the historical details of the Church's suppression of the divine feminine is shared through a conversation between Zoe and Thalia, a fellow captive.  Evidence of Sophia's existence, and of the role the Church played in executing her, came into the hands of the Nazis during World War II.  The search for this evidence is the foundation of *Daughter of God*.  Rival

groups, including a conservative arm of the Church, the Russian mafia and former KGB, and the heroes all strive to obtain this evidence for their own underlying purpose. Brown's expression of his religious themes in *The Da Vinci Code* differ markedly from Perdue's expression of his themes in *Daughter of God*.

### 2. <u>Total Concept and Feel</u>

The total concept and feel of a literary work is comprised of the way an author "selected, coordinated and arranged the elements of his or her work," <u>Feist Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 358, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), taking into consideration similarities in "mood, detail or characterization." <u>Reyher</u>, 533 F.2d at 91-92. Where there is a marked difference in total concept and feel, summary judgment is appropriate. <u>Id.</u> at 92; <u>see also</u> <u>Denker v. Uhry</u>, 820 F.Supp. 722, 731 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 301 (2d Cir. 1993). Although both novels at issue are mystery thrillers, *Daughter of God* is more action-packed, with several gunfights and violent deaths. *Daughter of God* also includes a perilous journey through an Austrian salt mine and includes sex scenes not present in *The Da Vinci Code*. *The Da Vinci Code*, on the other hand, is an intellectual, complex treasure hunt, focusing more on the codes, number sequences, cryptexes and hidden messages left behind as clues than on any physical adventure. For example, Neveu, Langdon, Teabing and his servant's escape from the police in a Range Rover through the dark woods proceeds at such a slow pace that it cannot reasonably be called a chase scene.

Furthermore, although *Daughter of God* references art and discusses religious history, *The Da Vinci Code's* treatment of these subjects involves more detail. Brown weaves his mystery through detailed discussions of Da Vinci's art, art and religious history and mathematical formulas. An early scene, involving Neveu and Langdon's attempt to decipher the

clues Sauniere left at his murder site, references Leonardo da Vinci's Vitruvian Man, the Fibonacci sequence, the Divine Proportion, *Phi*, and the Mona Lisa. *Daughter of God*'s discussion of art, on the other hand, occurs principally through Thalia and Zoe's review of the art stolen by the Russians as they work to catalogue all the stolen pieces. No reasonable jury could conclude that the total concept and feel of *The Da Vinci Code* is substantially similar to that of *Daughter of God*.

### 3. Plot

A plot is "the story or narrative. It is the designed sequence of connected incidents. It is the thing which moves the [work] from cause to effect. It means, as its etymology implies, a weaving together." Golding v. RKO Radio Pictures, Inc., 193 P.2d 153, 163 (Cal.App. 2 Distr. 1948), *aff'd* 35 Cal.2d 690, 221 P.2d 95 (1950). Although "in its broader outline a plot is never copyrightable," Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 54 (2d Cir. 1936), alleged similarities in plot and structure at "the next level of specificity" may be protectible. Id. at 49. Courts are to determine whether the fundamental essence and structure of the novels are substantially similar. See Arden v. Columbia Pictures Industries, Inc., 908 F.Supp. 1248, 1260 (S.D.N.Y. Dec. 7, 1995) (finding no substantial similarities between the fundamental structure and essence of each plot).

At the most general level of abstraction, both novels tell a story based on religious and historical people, places and events. The factual details that underpin each book, however, are quite different. The scenes and events show no substantial similarity of expression in the respective works. For example, while the *The Da Vinci Code* weaves a story with historical references to Michelangelo and Leonardo da Vinci, Opus Dei and the Priory of Sion; *Daughter of God* discusses Adolph Hitler and the Nazis, Hermann Goering, Frederick Stahl, and the

Congregation for the Doctrine of Faith.  Indeed, *The Da Vinci Code*'s incorporation of mathematical subjects like Phi, the Divine Proportion and the Fibonacci Sequence into its story has no parallel in *Daughter of God*.

*Daughter of God* involves a husband's search for his missing wife.  His search uncovers a religious secret involving a fictional second Messiah, the knowledge of which is being sought by a radical arm of the Catholic Church and by the Russian mafia and former KGB for their own evil purposes.  The husband's search for his wife leads him to different parts of the globe.  Furthermore, in *Daughter of God*, the search is for actual physical objects, including documents evidencing Sophia's existence and her burial shroud.  In *The Da Vinci Code*, the plot centers on determining what the secret is.  Langdon and Neveu's mission, as the protagonists, is to decipher, through clues left behind by her murdered grandfather as well as clues hidden in historical places and works of art, the ancient secret.  Furthermore, Langdon and Neveu never actually find any physical objects.  Rather, the secret they learn is that Neveu is a descendant of Christ, that her grandmother and brother are actually alive, and that Mary Magdalene's bones may be hidden beneath the inverted pyramid at the Louvre.  The fundamental essence and structure of the plots are not substantially similar and offer no support to Perdue's infringement claim.  *The Da Vinci Code* is simply a different story than that told by *Daughter of God*.

**4.  Characters**

In determining whether characters are similar, a court looks at the "totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in [plaintiff's work]."  <u>Walker</u>, 784 F.2d at 50 (internal quotations and citations omitted).  What the character thinks, feels, says and does as well as the descriptions conveyed by the author through other characters' comments fill out a viewer's understanding of the character.  <u>Warner Bros. v. American Broadcasting Cos.</u>, 720 F.2d 231, 241

(2d Cir. 1983). "At the same time, the visual perception of the character tends to create a dominant impression against which the similarity of a defendant's character may be readily compared, and significant differences readily noted." Id.

There is no substantial similarity between any of the characters in *The Da Vinci Code* and *Daughter of God*. The heroes and heroines are different in each book. In *The Da Vinci Code*, the hero is Robert Langdon, a bookish professor of symbology from Harvard. Langdon's physical attributes are not emphasized, rather, he serves as the intellectual wheel that keeps the plot moving. It is Langdon who solves most of the major riddles and questions, including the final puzzle at the climax. Interestingly, Langdon is secular, and his interests in religious history are purely academic. In *Daughter of God*, the hero is Seth Ridgeway, a former police officer who has athletic prowess and strong physical attributes. Seth retired from the police department after receiving several gunshot wounds. Although he is a professor of philosophy and religion, the book does not focus on his intellect. Unlike Langdon, Ridgeway experiences a crisis of faith because of his wife's disappearance.

The heroines also share few similarities. Sophie Neveu, the young French symbologist, was raised by her grandfather in a life of privilege. Her intellect, coupled with her knowledge of cryptology, allow her to assist in solving the many riddles and puzzles left by Sauniere. Seth Ridgeway's wife, Zoe, on the other hand, is a more mature, self-employed art appraiser. She is an expert in her field. She has been trained in detecting forgeries and grew up in a blue collar household.

Sir Leigh Teabing serves as the primary villain in *The Da Vinci Code*, but his evil role as the "Teacher," who masterminded Sauniere's execution, is not revealed until the end of the novel. He has two associates, Remy, his assistant, and Silas, the albino monk. Remy's involvement is minor while Silas serves the role as the threatening killer. Indeed, it is through

Silas' hands that Sauniere and the other members of the Priory of Sion are murdered.  Teabing's quest for the Holy Grail is motivated by his distaste for the Church.

*Daughter of God*, on the other hand, has many villains.  One set of villains include Russian mobsters and former KGB, who desire the Sophia documents and Shroud for power. Although the Russians dominate the early part of the book, their presence is minimized after Zoe kills the Hulk, her huge Russian captor, and escapes from their detention.  Another set of villains include Cardinal Braun and his lackey, NSA Agent Stratton.  Braun's desire for the Sophia materials also stems from a desire for more power.  In this regard, as well as in physical attributes, he is nothing like *The Da Vinci Code*'s antagonist, Teabing, who is crippled and uses crutches when he walks.  Further, although Perdue argues that Teabing and Stratton are both "shapeshifters" (because they first appear friendly and later reveal themselves as the enemy), such a characterization ignores the different roles each serves in their respective novels.  Teabing is the ultimate villain in *The Da Vinci Code*.  His mysterious alter-ego, the "Teacher," is smart, conniving, diligent and well planned.  Stratton, on the other hand, is simply a lackey for Cardinal Braun.  Stratton, from physical appearance to mental and intellectual characteristics, shares nothing in common with Teabing.  Other main characters such as Bezu Fache, the police captain who chases Langdon and Neveu in *The Da Vinci Code*, Father Aringosa, the head of Opus Dei in *The Da Vinci Code*, and Father Hans Morgan, the reformist priest in *Daughter of God*, have no parallels in the other book.

### 5. <u>Sequence, Pace and Setting</u>

Although both *Daughter of God* and *The Da Vinci Code*, as mystery thrillers, enjoy fast paced scenes, the time sequence of each book differs considerably.  *Daughter of God* takes place over many months.  Indeed, after the opening sequence introducing Zoe, Seth and Max in

Switzerland, Seth is found in his boat *six months later*, still suffering from Zoe's disappearance. After Seth is visited by the strange woman with information concerning Zoe on his boat, the novel proceeds at a quick but steady pace over the course of a few weeks. *The Da Vinci Code*, however, starts quickly and moves quickly. The reader immediately gets a sense that time is of the essence. The period from Sauniere's death at the Louvre to the final confrontation at Westminster Abbey, the majority of the novel, takes place over a matter of days.

The setting of each book is also different. While the *The Da Vinci Code* takes the reader from Paris to London and visits landmarks such as the Louvre Museum and Westminster Abbey, *Daughter of God* begins in Zurich, travels through southern California, Amsterdam and Italy and ends in Austria. The characters, sequence, pace and setting of each book are not substantially similar and do not support an infringement claim.

A comparison of these different novels warrants a rejection of the claim that Brown's *The Da Vinci Code* infringes upon copyrights Perdue owns in his previous works *Daughter of God and The Da Vinci Legacy*.

## REMAINING COUNTERCLAIMS

In his Third Counterclaim, Perdue alleges that "[a]s a result of [counterclaim defendants'] illegal and improper exploitation of [his] intellectual property, [counterclaim defendants] have been unjustly enriched at the sole expense and to the sole detriment of [Perdue]." Perdue's Answer and Counterclaims ¶ 107.[8]

Under the Copyright Act, state law claims are preempted if "(1) the particular work to

---

[8] Although dismissal of Perdue's federal claims allows dismissal of his state common law unjust enrichment claim without prejudice to their commencement in state court, this Court exercises jurisdiction over this pendant claim and dismisses it on its merits. See United Mine Worker's of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." Briarpatch Limited, L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004). The works in question fall within the types of works protected under 17 U.S.C. §§ 102 and 103. Moreover, Perdue's unjust enrichment claim is based entirely on the validity of his copyright claim. He alleges no facts to support his unjust enrichment claim different from his copyright infringement claim. Accordingly, his unjust enrichment claim must also be dismissed.

Relatedly, Perdue's second counterclaim for an accounting of all income, expenses and profits related to *The Da Vinci Code*, and his fourth counterclaim for a permanent injunction enjoining counterclaim defendants from all activities related to the production of the motion picture version of *The Da Vinci Code,* must also be dismissed. His accounting claim is pled on the grounds that he is unable to ascertain the amount of money owed by plaintiffs without an accounting. As his underlying infringement claim is unsupportable, no money is owed and no accounting is necessary. Under that same principle, Perdue's derivative claim against the motion picture defendants must also be dismissed.

## CONCLUSION

A reasonable average lay observer would not conclude that *The Da Vinci Code* is substantially similar to *Daughter of God*. Any slightly similar elements are on the level of generalized or otherwise unprotectible ideas. Defendant Perdue's motion for summary judgment is denied and all of his counterclaims are dismissed. Plaintiffs' motion for summary judgment is granted. Plaintiffs are awarded declaratory judgment declaring that plaintiffs' authorship, publication and exploitation of rights in and to *The Da Vinci Code* do not infringe any copyrights

owned by defendant.

Dated: New York, New York
     August 4, 2005

SO ORDERED:

_George B. Daniels_
GEORGE B. DANIELS
United States District Judge